# EXHIBIT A



<u>INDEPENDENT SALESPERSON AGREEMENT</u>

     This agreement (hereinafter referred to as the "Agreement") is for Real Estate Salesperson and Brokerage Services ("Brokerage Services") described in the attached Exhibit A, which is part of this Agreement, to be provided by Karen Cantor (the "Salesperson") to Bohemia Realty Group ("BRG" or "Company").

<u>TERM</u>

1. The term of this Agreement will begin on February 1, 2012, and will continue until terminated within ten (10) days' written notice by either party for any reason (the "Term").

2. During the Term, the Salesperson agrees to perform the Brokerage Services pursuant to this Agreement as an independent contractor. The Salesperson acknowledges and agrees that the Brokerage Services are to be provided in a competent and professional manner with promptness and diligence (i) in accordance with all applicable New York and United States federal, state and local laws, rules and regulations, (ii) in accordance with applicable industry rules, and (iii) in all respects to the satisfaction of the Company.  The Salesperson represents and warrants that he or she has been granted a valid and current Real Estate Salesperson or Associate Broker's license by the appropriate department of the State of New York (the "Sales License") and shall provide a copy to the Company upon execution of this Agreement.  The Salesperson agrees further to promptly and regularly take all necessary action and make all required payments to maintain the sales license in force and current, including but not limited to maintain continuing education requirements, such expense to be borne solely by the Salesperson.  If at any time the sales license is revoked, suspended, canceled or in any way compromised or limited, the Salesperson immediately agrees to notify the Company, in writing, of any and all such facts.

3. The Salesperson shall promptly make any and all changes in his/her performance as the Company may reasonably request from time to time.  The Salesperson shall provide the Brokerage Services as

requested by the Company with respect to various matters, including but not limited to, those described in Exhibit A herein.

4. As compensation for the provision of the Brokerage Services, during the Term of this Agreement the Company will pay to the Salesperson a percentage of the total commission payable, and actually paid, to the Company with respect to a specific transaction on which the Salesperson provided services (the "Commission Split"). The Company will use reasonable and appropriate efforts to collect the total commission payable to the Company as a result of the Salesperson's Brokerage Services.

   With respect to transactions procured and originating solely and directly by and through the Salesperson and on which the Salesperson was the sole BRG broker, agent or Principal working on the transaction, Salesperson shall be entitled to a commission split, calculated with reference to the total commissions payable and, actually paid, to the Company, i.e. prior to the Commission Split, on a calendar year basis ("Gross Annual Commissions"). NOTE: the commission split and desk fee schedule is outlined in the attached riders.

   For all transactions where Salesperson does not solely procure the transaction and/or works in concert with another BRG broker, agent or Principal, commission amounts and splits shall be reasonably determined on a case-by-case basis, by prior written agreement with the Salesperson. On each transaction for which a commission is payable, the commission amount due the Salesperson shall be reflected in a Deal Report following conclusion of the transaction. The Company shall make commission payment to the Salesperson or the Salesperson's designated entity, within ten (10) days of the Company's receipt in full of the full commission amount or installment.

   For all transactions where Salesperson refers a customer, landlord or tenant to another BRG broker, agent or Principal, Salesperson shall be entitled to a referral commission, the amount of which is to be mutually agreed upon between Salesperson and the Company.

   For purposes of this Agreement, the term "Principal" shall mean the owner of an equity interest in the Company.

5. The Company shall make available and furnish to the Salesperson reasonable office supplies and equipment for the Salesperson's use during the Term of this Agreement in the Company's office. The Company shall, at its expense, provide to Salesperson an email address and service and access to appropriate real estate databases as determined necessary by the Company. The Company shall determine in its discretion under what terms to assign a designated

multi-use or private office or a dedicated desk to the Salesperson, depending on, among other things, the Salesperson's sales performance, any office duties assumed by her/him and gross commission production.

6.  The Company shall not pay for or reimburse the Salesperson for meals or entertainment with customers, for taxis or transportation, airfare of any sort, telephone charges, or for cellular phone equipment or service.

7.  The Company shall not pay for or reimburse the Salesperson for licensure, continuing education, real estate salesperson license fees or costs, or for membership in any professional clubs or organizations.

8.  In connection with the marketing of a property available for sale or lease for which the Company is acting as the sole exclusive agent of the person or entity that seeks to sell or lease such property (an "Exclusive Listing") procured by Salesperson, Company shall provide and pay for reasonable and appropriate advertising, marketing and signage ("Publicity") shall be determined in Company's sole, but reasonable, discretion.  Notwithstanding, such discretionary rights, in such situations, i.e., when Salesperson has procured and Exclusive Listing, all Publicity shall include the name and telephone number of Salesperson in a font size and type within such Publicity to reasonably achieve notice of Salesperson's name and identity.

9.  Nothing under this Agreement shall be construed as creating any partnership, joint venture or agency between the Company and the Salesperson.  The Salesperson shall act solely as an independent contractor and, as such, is not authorized to bind the Company to third parties.

10. Neither federal, state, nor local taxes of any kind shall be withheld or paid by the Company on behalf of the Salesperson in connection with payments made by the Company under this Agreement.  The Salesperson shall be responsible for determining the amounts of and making all applicable tax payments.  The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) arising out of or relating to the foregoing responsibility of the Salesperson.

11. The Salesperson is not an employee of the Company and is not entitled to actively participate in any of the Company's current or future employee benefit plans, including, but not limited to, any retirement, pension, profit sharing, group insurance, health insurance or similar plans that

have been or may be instituted by BRG, for the benefit of its employees.

12. The Salesperson represents and warrants that he/she maintains and will maintain in effect all insurance as may be required by law.  The Company will maintain errors and omissions insurance coverage for the Company and its Salespersons.

13. During the course of Salesperson's engagement hereunder, the Salesperson may receive confidential information of and/or be in the possession of confidential information from the Company, including but not limited to, customer lists, listing information, landlord contacts and proprietary information, customer financial information, client information, services provided to such clients, trade secrets, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works or authorship, discoveries, techniques, copyrights, patents, trademarks, computer software, and any and all information and know-how not or in the future, whether or not such confidential information relates to any Work Product, as defined herein, including without limitation, the underlying concept and production methodology of such Work Product, (but excluding information and data developed or produced by Salesperson, prior to, or during the Term, information and data that may in the public domain and information and data obtain from third parties not intended for use by the Company)(hereinafter "Confidential Information").  Salesperson acknowledges and agrees that he/she has no claim, right, title, property or other interest of any kind in the Confidential Information. The Salesperson shall hold and maintain the Confidential Information in strictest of confidence and in trust for the Company's sole and exclusive benefit.  The Salesperson agreed to keep all Confidential Information in a secure place and further agrees not to publish, communicate, divulge, use or disclose directly or indirectly, for his/her own benefit or for the benefit of another, or for any purpose other than in furtherance of the Salesperson's duties hereunder, either during or after his/her engagement as a Salesperson hereunder, any Confidential Information.  Salesperson shall not discuss or disclose any Confidential Information with or to any person whatsoever, or permit any person whatsoever to examine and /or make copes of any Work Product, except as require to perform the Brokerage Services to Company or as requested by law.  Upon termination of this Agreement or upon the earlier request of the Company, the Salesperson shall deliver all written and/or recorded material, including without limitation, paper, film, cards, tapes, dvds, cds, discs and the storage facilities, in Salesperson's possession, custody or control which contain any Work

Product and/or Confidential Information of the Company, and all copies thereof, to the Company.

(b)      If the Salesperson is requested or required by any court, agency or other governmental authority to disclose any Confidential Information, he/she shall promptly notify the Company so as to permit the Company to seek a protective order or take other appropriate action.  If, in the absence of a protective order, the Salesperson is compelled as a matter of law to disclose any Confidential Information, the Salesperson shall disclose to the party compelling disclosure only such part of the Confidential Information as is required by law to be disclosed.  The Salesperson shall exercise his/her best efforts to obtain assurances that confidential treatment shall be accorded Confidential Information disclosed under such circumstances.

(c)      The Salesperson acknowledges that the Confidential Information is particularly sensitive and of substantial importance to the Company; accordingly, the Salesperson agrees that the provisions of this Section dealing with Work Product and Confidential Information shall survive any termination of this Agreement and shall be enforceable against the Salesperson in perpetuity.

(d)      The Salesperson acknowledges he/she will have access to Confidential Information.  If the Company so elects, it shall be entitled, in addition to all other remedies available, including, but not limited to, actual, compensatory and punitive damages, to obtain damages and, provided that the Company obtains a final judgment of any breach of this Agreement or to specifically enforce the performance by Salesperson and to enjoin the violation by Salesperson of any provision hereof.  Salesperson further acknowledges that a violation of this Section 13 hereunder would cause irreparable and continuing damage to the Company for which money damages alone would not adequately compensate.  Accordingly, the Salesperson acknowledges that, in the event of violation of this Section 13 of this Agreement, the Company shall be entitled to preliminary and permanent injunctive relief without having to prove actual damages or immediate or irreparable harm or to post a bond.

(e)      For the purposes of this Agreement, the term "Work Product" shall refer to all proposals, research, records, reports, recommendations, manuals, polices and procedures, finding, evaluations, forms, reviews, information, data, computer software or programs, and written materials originated or prepared by Salesperson for and in the performance of the Brokerage Services hereunder.  Such Work Product shall become the exclusive property of BRG, and Salesperson shall relinquish and hereby assigns any and all right, title and interest in and to such Work Product to BRG, subject to the rights of Salesperson that survive the Term, and which rights, among other things, may allow Salesperson to exploit such Work Product.  Work Product

shall not include customers, landlords and tenants with whom the Salesperson has worked prior to the Term, and those procured by the Salesperson during the Term, whether or not such customer, landlord or tenant did business with the Company on an exclusive basis.

14.     The Salesperson represents and warrants to the Company that he/she is not subject to any contractual or other restriction or obligation that is inconsistent with any representation, obligation or assignment of Salesperson, any rights of the Company under this Agreement or Salesperson's acceptance of engagement with or performance of the Brokerage Services for the Company.

15.     The Salesperson represents and warrants that he/she has no been convicted of a felony crime.

16.     Throughout the Term of this Agreement, the Salesperson shall devote his/her working time, attention, knowledge and skills in furtherance of the business of the Company and will perform such duties faithfully, diligently, and to the best of his/her ability.  Salesperson shall not engage, and shall not solicit any other associates or employees of the Company or its affiliates to engage in any other commercial activities that may in any way interfere with the performance of his/her duties or responsibilities to the Company.

17.     Thought the Term of this Agreement, Salesperson will not, for any reason, directly or indirectly (whether as director, stockholder, owner, partner, consultant, principal, employee, independent contractor, agent or otherwise), engage in or contribute his/her knowledge to "Directly Competitive Work" (as defined below), unless Salesperson receives advance written permission to so do, signed by a principal of the Company, after having furnished proof satisfactory to the Company, including assurances from Salesperson and his/her new employer or Brokerage, that his/her performance for such Directly Competitive Work would not cause Salesperson to disclose, base judgments on or use any Confidential Information he/she acquired during the Term of this Agreement, or impair customer, vendor or business partner relations or the Company's goodwill, or otherwise cause special harm to the Company.

Permission to engage in competitive work, or expiration of the restricted period stated above, shall **not** release Salesperson from his/her obligation not to use or disclose Confidential Information, which shall remain proprietary to the Company.

18. For a period of two (2) years following the termination of this Agreement, Salesperson will not, for any reason, directly or indirectly: (i) solicit or recruit for employment, hire, employ or attempt to employ or engage as an independent contractor or consultant any individual employed by or associated with the Company as of the termination of this Agreement or

during the last year of the Term, or entice or suggest to such individual to terminate his or her employment of association with the Company; (ii) canvas or solicit business from any customer, tenant, or landlord with whom the Company did business during the Term of this Agreement, except for any such customer, client, tenant or landlord whose business with the Company was exclusively or primarily accomplished (A) by Salesperson, or (B) through Salesperson's direct and personal efforts, or, in any such circumstance, an entity affiliated with, and controlled by, such customer, client, tenant or landlord.

19. After the Term, nothing in this Agreement shall prevent the Salesperson from: working with or representing a customer, client, landlord or tenant that worked with Salesperson during the Term, provided that the Salesperson does not solicit such customer, client, landlord or tenant during the Term or within two (2) years following the expiration of the Term in violation of the prohibitions provided for in section 18(ii), hereof.

20. For a period of two (2) year following the termination of this Agreement, Salesperson will not take any action which is intended, or would reasonably be expected, to adversely affect the Company, its business, its Principals, reputation or its relationship with its customers or prospective customers, vendors, business partners or the Company's employees, except as otherwise permitted hereby, the aforementioned collectively referred to as "Non-Disparagement Agreement" or "Non-Disparagement." Notwithstanding Salesperson's obligation under this paragraph 20, Salesperson shall have the right, following the Term, to engage in work constituting, concerning or relate to, the sales, leasing and brokerage of commercial real estate in any borough located in New York City, albeit subject to the restrictions on solicitations as wet forth in paragraph 18.

21. The Salesperson understands that the Company will have the right to pursue arbitration against him/her for violation of the Non-Solicitation and to collect monetary damages if a court or arbitrator finds that any violation of this Non-Solicitation resulted in any monetary loss to the Company. Salesperson agrees that his/her violation of any of the Terms of the Non-Solicitation will result in irreparable harm and continuing damage to the Company for which monetary dames may not provide and adequate remedy. Therefore, in addition to the Company's right to pursue arbitration against Salesperson for money damages, Salesperson agrees that the Company shall have the right to apply to a court for a temporary restraining order, and/or temporary or permanent injunction preventing him/her from violating the provisions of this Agreement. Salesperson hereby submits to the jurisdiction of the Supreme Court of the State of New York, and the United States District Court of the Southern District of New York, for the purpose of such enforcement and Salesperson waives, and agrees not to assert, as a defense in any such

action or proceeding, that he/she was not subject to the personal jurisdiction of that court or that venue is improper for lack of residence, inconvenient forum or otherwise.  Salesperson also agrees that services of process (the method by which Salesperson may be served with any such court papers) may be made upon him/her by nationally recognized overnight delivery service at the address last known to the Company.  The Company may also have other rights and remedies it may have at any time against Salesperson, whether by law or under this Agreement.  In the event the Company obtains any relief from a court against Salesperson, either in the form of a temporary restraining order, injunction or monetary damages, Salesperson, either in the form of a temporary restraining in order, injunction or monetary damages, Salesperson agrees to pay any costs and expenses, including, provided that the Company obtains a final judgment in it favor, reasonable attorney's fees, incurred by the Company in enforcing its rights and Salesperson's obligations under this Agreement.

22. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.  No oral agreement, statement, promise, commitment or representation shall alter or terminate the provisions of this Agreement.  This Agreement may only be amended in writing signed by a principal of the Company.

23. This Agreement shall be construed, governed by and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles.  Any action arising out of or relating to this Agreement may, at the election of the Company, be brought and prosecuted only in that State, and in the event of such election, Salesperson consents to the jurisdiction and venue of any court in such jurisdiction and waives trial by jury.

24. If any term, provision, covenant or restriction contained in this Agreement, or any part thereof, is held by a court of competent jurisdiction or any foreign, federal, state, county or local government or any other governmental regulatory or administrative agency or authority to by invalid, void, unenforceable or against public policy for any reason, the remainder of the terms, provision, covenants and restrictions contained in this Agreement, or any part thereof, to be unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provision and, in its reduced form, such provision shall then by enforceable and shall be enforced.

25. The Salesperson represents and warrants that he/she has not been sued for negligence of malpractice, misrepresentation or similar claims or allegations in connection with the provision of real estate brokerage or sales services.

26. The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorney's fees and expenses) arising out of or relating to (i) the gross negligence or willful misconduct in the performance and observance of Salesperson's responsibilities under this Agreement, (ii) a grossly negligent act or omission of Salesperson or any of Salesperson's agents in connection with Salesperson's performance under this Agreement or (iii) Salesperson's breach of any material term or condition of this Agreement, including, without limitation, the representations and warranties set forth herein, and (iv) any act or omission by Salesperson deemed an intentional tort, or conduct that supports an award for punitive damages, as determined by a trier of fact or arbitrator. The Company may elect to retain its own counsel and to participate in the defense of any claim or action arising out of or relating to the foregoing. The Salesperson shall not settle or compromise any claim or action hereunder, including, without limitation, any claim for equitable relief, without the Company's prior written consent, which consent shall not be unreasonably withheld.

27. The Salesperson waives any claim, right or entitlement to punitive damages, indirect damages or consequential damages in connection with any dispute under this Agreement.

28. Salesperson agrees not to disclose the terms of this Agreement, except in the following circumstances:

(a) Salesperson may disclose the terms of this Agreement to his/her immediate family, so long as such family members agree to be bound by the confidential nature of this Agreement;

(b) Salesperson may disclose the terms of this Agreement to (i) his/her tax advisors so long as such tax advisors agree in writing to be bound by the confidential nature of this Agreement; (ii) taxing authorities if requested by such authorities and so long as they are advised in writing of the confidential nature of this Agreement; or (iii) Salesperson's legal counsel; and

(c) Pursuant to the order of a court or governmental agency of competent jurisdiction, or for purposes of securing enforcement of the terms and conditions of this Agreement.

29. All notices and other communications hereunder shall be in writing and shall be both sent via email and by one of the following hard-copy means: (a) personal delivered by messenger or (b) overnight couriers such as Federal Express, with instructions for delivery on the next business day, addressed as follows:

If to the Company:                        If to the Salesperson:

Bohemia Realty Group

Each party hereto may designate in writing a new address to which any notice or other communication may thereafter be so given, served or sent.  Each notice or other communication that shall be mailed in the manner described above, shall be deemed sufficiently give, served, sent or received for all purposes at such time as it is delivered to the addressee or at such time as delivery is refused by the addressee upon presentation.

30. This Agreement may not be assigned, transferred or subcontracted, in whole or in part, by the Salesperson, except to an entity solely and exclusively controlled by the Salesperson.

31. As a condition of Salesperson's provision of Brokerage Services to the Company, the parties agree that any controversy or claim arising out of, or relating to, any aspect of his/her relationship with the Company, the termination thereof, of this Agreement including, but not limited to, commission disputes, claims for breach or any contract or covenant whether express or implied, claims for compensation or benefits of any kind, tort claims, and claims for violation of any federal, state or local law, statute, regulation or ordinance shall be submitted for binding arbitration in the County of New York, State of New York to the American Arbitration Association ("AAA") and shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the AAA.  The arbitrator shall not have the authority to award attorney's fees, arbitration filing fee and administrative costs, or general costs to either party.  Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy.  Nothing in this Section precludes a party from seeking injunctive relief in court in connection with any claim requiring injunctive relief.

32. This Agreement sets forth the entire understanding and agreement of the parties hereto relating to the retention of the Salesperson by the Company, and all other previous or contemporaneous understandings or agreements relating to the retention of the Salesperson by the Company, whether written or oral, are hereby superseded.  No waiver or any one provision shall be construed as a waiver of any other provision and the fact that an obligation is waived for a period of time shall not be considered to be a continuous waiver.

33. The Salesperson represents and warrants that he/she has carefully read this Agreement, has consulted with legal counsel and/or advisors of his/her choice (or has declined to consult advisors) fully understands all provisions of this Agreement, and executes this Agreement knowingly and willingly.

34. Within ten (10) days of either party's notice of termination of this Agreement, Salesperson shall prepare a list of all pending transactions, (which list shall indicate whether the Salesperson contends he/she was a procuring cause of the pending transaction or rather, has negotiated the pending transaction), and the gross commissions earned from such pending transactions shall be distributed as follows:

(a) With respect to any pending transactions procured by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(b) With respect to any pending transaction negotiated by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

(c) With respect to any pending transactions procured by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(d) With respect to any pending transactions negotiated by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

**35.  All desk fees are due the first of each month.  If not received by the 7th of the month, a $50 late fee will be charged for each week late.**

The determination of whether or not a transaction was "procured" by the Salesperson shall be reasonably agreed to by the parties, using industry standards and conventions, reasonably applied, including, but not limited to, the party making the initial contact with a customer, landlord or tenant, and the ongoing frequency and/or quality of contact with such customer, landlord or tenant.  Any disputes under this paragraph shall be determined by binding arbitration conducted on an expedited basis.

By the signature below, the parties acknowledge, each has **READ AND UNDERSTOOD** this Independent Salesperson Agreement, including the non-disclosure, non-solicitation and non-competition paragraphs, and that each knowingly, freely and voluntarily accept, and agrees to be bound by, its terms.

**AGREED TO AND ACCEPTED:**

By: _____     _____
　　　　　　[Agent]　　　　　　　　　　　　　Date

**BRG**

By: _____     _____
　　　　　　[Agent]　　　　　　　　　　　　　Date

## EXHIBIT A

The Brokerage Services shall include, but not be limited to, the following:

During times and at a place determined by the Salesperson, the Salesperson shall engage in the rental, sales and brokerage of real estate; principally, **commercial** real estate in the Borough of Manhattan.  Said sales and brokerage activities shall include but not limited to developing and pursuing customer leads, developing and pursuing Exclusive Listings with property owners, negotiating the sale and lease of office, residential and retail real estate, and marketing the Company's exclusive listings.



## OLD AGENT SPLITS – PLAN C

60%/40% split ON EXCLUSIVES/APTS TREATED LIKE EXCLUSIVES

70%/30% SPLIT ON OPENS

80%/20% SPLIT IF YOU BRING IN A LISTING

VIRTUAL AGENTS – $200 month

Actual desk fees to be determined on a case–by–case basis.

Agreed to and accepted:

By:

_____            _____
AGENT                                              Date

BRG

By:

_____            _____
AGENT                                              Date



## COMPANY PLEDGE

**As an agent at Bohemia Realty Group, I pledge to myself, my fellow agents, and the company, that:**

- I will read and follow procedures
- I will return my calls in a timely manner
- I will show up on time to my appointments, and if I cannot, I will contact my clients to let them know I'm running late
- I will treat my clients with respect and courtesy
- I will work with other agents in the company even if it doesn't immediately financially benefit me; I will be a team player
- If I commit to a task, I will follow it through

**My behavior is a reflection of the company and my colleagues, and, as such, I promise to always promote a positive image for Bohemia Realty Group.**

NAME _Karen Cantor_         DATE _3/6/12_

SIGNATURE _____

WITNESS _____



DESK CONTRACT

Beginning 6/1/2012, Karen Cantor will be renting a Private office for $1500/monthly.

The term of this agreement is for 1 year.  If either party decides to break this contract, a 30 day written notice is required.

Payment is due on the first of the month.  A $50 late fee will be charged for each week that the desk fee is late.

Agreed to and accepted:

By:

_____
AGENT

5/30/12
_____
DATE

BRG

_____
AGENT

5/30/12
_____
DATE



# Bohemia Realty Group, LLC BYOD Policy

Bohemia Realty Group, LLC (the Company) grants its agents the privilege of purchasing and using personal smartphones and tablets of their choosing at work for their convenience. Bohemia Realty Group, LLC reserves the right to revoke this privilege if users do not abide by the policies and procedures outlined below.

This policy is intended to protect the security and integrity of Bohemia Realty Group, LLC's data and technology infrastructure. Limited exceptions to the policy may occur due to variations in devices and platforms.

Bohemia Realty Group, LLC agents must agree to the terms and conditions set forth in this policy in order to be able to connect their personal devices to the company network.

## Acceptable Use

- The company defines acceptable business use as activities that directly or indirectly support the business of Bohemia Realty Group, LLC
- Devices may not be used at any time to:
    - Store or transmit illicit materials
    - Store or transmit proprietary information belonging to another company
    - Harass others
- Agents may use their mobile device to access the following company-owned resources: email, calendars, contacts, documents, etc.

## Devices and Support

- Smartphones including iPhone, Android, Blackberry and Windows phones are allowed
- Tablets including iPad, Windows SurfaceRT and Android are allowed
- Connectivity issues are supported by Bohemia Realty Group, LLC first, if problems are determined to be related to carrier or device manufacturer, agents should contact the device manufacturer or their carrier for operating system or hardware-related issues.



*$ 10,000 monthly*

# CONTRACT ADDENDUM

**POSITION** - **Head of Rental Operations**: Karen Paul

**COMPENSATION** - $120,000 calendar year (January 01, 2019 – December 31, 2019)
*Compensation is contingent on the satisfactory completion of specific position duties. the following list enumerates foundational duties of the position. This list is NOT exhaustive.*

## DUTIES:

- Daily Account Management of BRG Listings:
  - 2-3 weekly proactive check in's with BRG accounts on current Vacancies
    - Getting Feedback
    - Giving Feedback to Land Lords (LL's)
    - Provide incentives for apartments not moving
    - Check out "hard to move" listings, personally if needed
- Supervise access and access issues
- Supervise app review and submission
- Supervise Listing Questions
- Supervise move-in issues
- Attend Lease Signings for LL Facetime. *Minimum of once a month*
- Create/Maintain system for agents to check out Listings. *Especially "hard to move" apt's*
- Create/Maintain system for having specific agents to focus on specific listings.
- Price Recommendations – running comps when needed for LL's
- View New Buildings as they open, for LL's
- Nurture Listings to Exclusive/Co-Exclusive
- Supervise procedure and LL info updates
- Promote Listings Internally & Incentivize Agents
- Give LL's weekly feedback – Based on Agent Reports, Recommendations, ect...



### INDEPENDENT SALESPERSON AGREEMENT

This agreement (hereinafter referred to as the "Agreement") is for Real Estate Salesperson and Brokerage Services ("Brokerage Services") described in the attached Exhibit A, which is part of this Agreement, to be provided by Chelsea Picken_____ (the "Salesperson") to Bohemia Realty Group ("BRG" or "Company").

TERM

1.  The term of this Agreement will begin on _7/18/17_____ and will continue until terminated within ten (10) days' written notice by either party for any reason (the "Term").

2.  During the Term, the Salesperson agrees to perform the Brokerage Services pursuant to this Agreement as an independent contractor. The Salesperson acknowledges and agrees that the Brokerage Services are to be provided in a competent and professional manner with promptness and diligence (i) in accordance with all applicable New York and United States federal, state and local laws, rules and regulations, (ii) in accordance with applicable industry rules, and (iii) in all respects to the satisfaction of the Company. The Salesperson represents and warrants that he or she has been granted a valid and current Real Estate Salesperson or Associate Broker's license by the appropriate department of the State of New York (the "Sales License") and shall provide a copy to the Company upon execution of this Agreement. The Salesperson agrees further to promptly and regularly take all necessary action and make all required payments to maintain the sales license in force and current, including but not limited to maintain continuing education requirements, such expense to be borne solely by the Salesperson. If at any time the sales license is revoked, suspended, canceled or in any way compromised or limited, the Salesperson immediately agrees to notify the Company, in writing, of any and all such facts.

3.  The Salesperson shall promptly make any and all changes in his/her performance as the Company may reasonably request from time to

1



time.  The Salesperson shall provide the Brokerage Services as requested by the Company with respect to various matters, including but not limited to, those described in Exhibit A herein.

4.   As compensation for the provision of the Brokerage Services, during the Term of this Agreement the Company will pay to the Salesperson a percentage of the total commission payable, and actually paid, to the Company with respect to a specific transaction on which the Salesperson provided services (the "Commission Split").  The Company will use reasonable and appropriate efforts to collect the total commission payable to the Company as a result of the Salesperson's Brokerage Services.

With respect to transactions procured and originating solely and directly by and through the Salesperson and on which the Salesperson was the sole BRG broker, agent or Principal working on the transaction, Salesperson shall be entitled to a commission split, calculated with reference to the total commissions payable and, actually paid, to the Company, i.e. prior to the Commission Split, on a calendar year basis ("Gross Annual Commissions").  NOTE: the commission split and desk fee schedule is outlined in the attached riders.

For all transactions where Salesperson does not solely procure the transaction and/or works in concert with another BRG broker, agent or Principal, commission amounts and splits shall be reasonably determined on a case-by-case basis, by prior written agreement with the Salesperson.  On each transaction for which a commission is payable, the commission amount due the Salesperson shall be reflected in a Deal Report following conclusion of the transaction.  The Company shall make commission payment to the Salesperson or the Salesperson's designated entity, within ten (10) days of the Company's receipt in full of the full commission amount or installment.

For all transactions where Salesperson refers a customer, landlord or tenant to another BRG broker, agent or Principal, Salesperson shall be entitled to a referral commission, the amount of which is to be mutually agreed upon between Salesperson and the Company.

For purposes of this Agreement, the term "Principal" shall mean the owner of an equity interest in the Company.

5.   The Company shall make available and furnish to the Salesperson reasonable office supplies and equipment for the Salesperson's use during the Term of this Agreement in the Company's office.  The Company shall, at its expense, provide to Salesperson an email address and service and access to appropriate real estate databases as determined necessary by the Company.  The Company shall determine in its discretion under what terms to assign a designated



multi-use or private office or a dedicated desk to the Salesperson, depending on, among other things, the Salesperson's sales performance, any office duties assumed by her/him and gross commission production.

6.   The Company shall not pay for or reimburse the Salesperson for meals or entertainment with customers, for taxis or transportation, airfare of any sort, telephone charges, or for cellular phone equipment or service.

7.   The Company shall not pay for or reimburse the Salesperson for licensure, continuing education, real estate salesperson license fees or costs, or for membership in any professional clubs or organizations.

8.   In connection with the marketing of a property available for sale or lease for which the Company is acting as the sole exclusive agent of the person or entity that seeks to sell or lease such property (an "Exclusive Listing") procured by Salesperson, Company shall provide and pay for reasonable and appropriate advertising, marketing and signage ("Publicity") shall be determined in Company's sole, but reasonable, discretion.  Notwithstanding, such discretionary rights, in such situations, i.e., when Salesperson has procured and Exclusive Listing, all Publicity shall include the name and telephone number of Salesperson in a font size and type within such Publicity to reasonably achieve notice of Salesperson's name and identity.

9.   Nothing under this Agreement shall be construed as creating any partnership, joint venture or agency between the Company and the Salesperson.  The Salesperson shall act solely as an independent contractor and, as such, is not authorized to bind the Company to third parties.

10.   Neither federal, state, nor local taxes of any kind shall be withheld or paid by the Company on behalf of the Salesperson in connection with payments made by the Company under this Agreement.  The Salesperson shall be responsible for determining the amounts of and making all applicable tax payments.  The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) arising out of or relating to the foregoing responsibility of the Salesperson.

11.   The Salesperson is not an employee of the Company and is not entitled to actively participate in any of the Company's current or future employee benefit plans, including, but not limited to, any retirement, pension, profit sharing, group insurance, health insurance

3



or similar plans that have been or may be instituted by BRG, for the benefit of its employees.

12.     The Salesperson represents and warrants that he/she maintains and will maintain in effect all insurance as may be required by law. The Company will maintain errors and omissions insurance coverage for the Company and its Salespersons.

13.     During the course of Salesperson's engagement hereunder, the Salesperson may receive confidential information of and/or be in the possession of confidential information from the Company, including but not limited to, customer lists, listing information, landlord contacts and proprietary information, customer financial information, client information, services provided to such clients, trade secrets, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works or authorship, discoveries, techniques, copyrights, patents, trademarks, computer software, and any and all information and know-how not or in the future, whether or not such confidential information relates to any Work Product, as defined herein, including without limitation, the underlying concept and production methodology of such Work Product, (but excluding information and data developed or produced by Salesperson, prior to, or during the Term, information and data that may in the public domain and information and data obtain from third parties not intended for use by the Company)(hereinafter "Confidential Information"). Salesperson acknowledges and agrees that he/she has no claim, right, title, property or other interest of any kind in the Confidential Information. The Salesperson shall hold and maintain the Confidential Information in strictest of confidence and in trust for the Company's sole and exclusive benefit. The Salesperson agreed to keep all Confidential Information in a secure place and further agrees not to publish, communicate, divulge, use or disclose directly or indirectly, for his/her own benefit or for the benefit of another, or for any purpose other than in furtherance of the Salesperson's duties hereunder, either during or after his/her engagement as a Salesperson hereunder, any Confidential Information. Salesperson shall not discuss or disclose any Confidential Information with or to any person whatsoever, or permit any person whatsoever to examine and /or make copes of any Work Product, except as require to perform the Brokerage Services to Company or as requested by law. Upon termination of this Agreement or upon the earlier request of the Company, the Salesperson shall deliver all written and/or recorded material, including without limitation, paper, film, cards, tapes, dvds, cds, discs and the storage facilities, in Salesperson's possession, custody or control which contain any Work Product and/or

4



Confidential Information of the Company, and all copies thereof, to the Company.

(b)    If the Salesperson is requested or required by any court, agency or other governmental authority to disclose any Confidential Information, he/she shall promptly notify the Company so as to permit the Company to seek a protective order or take other appropriate action. If, in the absence of a protective order, the Salesperson is compelled as a matter of law to disclose any Confidential Information, the Salesperson shall disclose to the party compelling disclosure only such part of the Confidential Information as is required by law to be disclosed. The Salesperson shall exercise his/her best efforts to obtain assurances that confidential treatment shall be accorded Confidential Information disclosed under such circumstances.

(c)    The Salesperson acknowledges that the Confidential Information is particularly sensitive and of substantial importance to the Company; accordingly, the Salesperson agrees that the provisions of this Section dealing with Work Product and Confidential Information shall survive any termination of this Agreement and shall be enforceable against the Salesperson in perpetuity.

(d)    The Salesperson acknowledges he/she will have access to Confidential Information. If the Company so elects, it shall be entitled, in addition to all other remedies available, including, but not limited to, actual, compensatory and punitive damages, to obtain damages and, provided that the Company obtains a final judgment of any breach of this Agreement or to specifically enforce the performance by Salesperson and to enjoin the violation by Salesperson of any provision hereof. Salesperson further acknowledges that a violation of this Section 13 hereunder would cause irreparable and continuing damage to the Company for which money damages alone would not adequately compensate. Accordingly, the Salesperson acknowledges that, in the event of violation of this Section 13 of this Agreement, the Company shall be entitled to preliminary and permanent injunctive relief without having to prove actual damages or immediate or irreparable harm or to post a bond.

(e)    For the purposes of this Agreement, the term "Work Product" shall refer to all proposals, research, records, reports, recommendations, manuals, polices and procedures, finding, evaluations, forms, reviews, information, data, computer software or programs, and written materials originated or prepared by Salesperson for and in the performance of the Brokerage Services hereunder. Such Work Product shall become the exclusive property of BRG, and Salesperson shall relinquish and hereby assigns any and all right, title and interest in and to such Work Product to BRG, subject to the rights of Salesperson that survive the Term, and which rights, among other things, may allow Salesperson to exploit such Work

5



Product.  Work Product shall not include customers, landlords and tenants with whom the Salesperson has worked prior to the Term, and those procured by the Salesperson during the Term, whether or not such customer, landlord or tenant did business with the Company on an exclusive basis.

14.    The Salesperson represents and warrants to the Company that he/she is not subject to any contractual or other restriction or obligation that is inconsistent with any representation, obligation or assignment of Salesperson, any rights of the Company under this Agreement or Salesperson's acceptance of engagement with or performance of the Brokerage Services for the Company.

15.    The Salesperson represents and warrants that he/she has no been convicted of a felony crime.

16.    Throughout the Term of this Agreement, the Salesperson shall devote his/her working time, attention, knowledge and skills in furtherance of the business of the Company and will perform such duties faithfully, diligently, and to the best of his/her ability.  Salesperson shall not engage, and shall not solicit any other associates or employees of the Company or its affiliates to engage in any other commercial activities that may in any way interfere with the performance of his/her duties or responsibilities to the Company.

17.    Thought the Term of this Agreement, Salesperson will not, for any reason, directly or indirectly (whether as director, stockholder, owner, partner, consultant, principal, employee, independent contractor, agent or otherwise), engage in or contribute his/her knowledge to "Directly Competitive Work" (as defined below), unless Salesperson receives advance written permission to so do, signed by a principal of the Company, after having furnished proof satisfactory to the Company, including assurances from Salesperson and his/her new employer or Brokerage, that his/her performance for such Directly Competitive Work would not cause Salesperson to disclose, base judgments on or use any Confidential Information he/she acquired during the Term of this Agreement, or impair customer, vendor or business partner relations or the Company's goodwill, or otherwise cause special harm to the Company.

Permission to engage in competitive work, or expiration of the restricted period stated above, shall **not** release Salesperson from his/her obligation not to use or disclose Confidential Information, which shall remain proprietary to the Company.

18. For a period of two (2) years following the termination of this Agreement, Salesperson will not, for any reason, directly or indirectly: (i) solicit or recruit for employment, hire, employ or attempt to employ or engage as an



independent contractor or consultant any individual employed by or associated with the Company as of the termination of this Agreement or during the last year of the Term, or entice or suggest to such individual to terminate his or her employment of association with the Company; (ii) canvas or solicit business from any customer, tenant, or landlord with whom the Company did business during the Term of this Agreement, except for any such customer, client, tenant or landlord whose business with the Company was exclusively or primarily accomplished (A) by Salesperson, or (B) through Salesperson's direct and personal efforts, or, in any such circumstance, an entity affiliated with, and controlled by, such customer, client, tenant or landlord.

19. After the Term, nothing in this Agreement shall prevent the Salesperson from: working with or representing a customer, client, landlord or tenant that worked with Salesperson during the Term, provided that the Salesperson does not solicit such customer, client, landlord or tenant during the Term or within two (2) years following the expiration of the Term in violation of the prohibitions provided for in section 18(ii), hereof.

20. For a period of two (2) year following the termination of this Agreement, Salesperson will not take any action which is intended, or would reasonably be expected, to adversely affect the Company, its business, its Principals, reputation or its relationship with its customers or prospective customers, vendors, business partners or the Company's employees, except as otherwise permitted hereby, the aforementioned collectively referred to as "Non-Disparagement Agreement" or "Non-Disparagement." Notwithstanding Salesperson's obligation under this paragraph 20, Salesperson shall have the right, following the Term, to engage in work constituting, concerning or relate to, the sales, leasing and brokerage of commercial real estate in any borough located in New York City, albeit subject to the restrictions on solicitations as wet forth in paragraph 18.

21. The Salesperson understands that the Company will have the right to pursue arbitration against him/her for violation of the Non-Solicitation and to collect monetary damages if a court or arbitrator finds that any violation of this Non-Solicitation resulted in any monetary loss to the Company. Salesperson agrees that his/her violation of any of the Terms of the Non-Solicitation will result in irreparable harm and continuing damage to the Company for which monetary dames may not provide and adequate remedy. Therefore, in addition to the Company's right to pursue arbitration against Salesperson for money damages, Salesperson agrees that the Company shall have the right to apply to a court for a temporary restraining order, and/or temporary or permanent injunction preventing him/her from violating the provisions of this Agreement.  Salesperson hereby submits to the jurisdiction of the Supreme Court of the State of New York, and the United States District Court of the Southern District of New York, for the purpose of



such enforcement and Salesperson waives, and agrees not to assert, as a defense in any such action or proceeding, that he/she was not subject to the personal jurisdiction of that court or that venue is improper for lack of residence, inconvenient forum or otherwise. Salesperson also agrees that services of process (the method by which Salesperson may be served with any such court papers) may be made upon him/her by nationally recognized overnight delivery service at the address last known to the Company. The Company may also have other rights and remedies it may have at any time against Salesperson, whether by law or under this Agreement. In the event the Company obtains any relief from a court against Salesperson, either in the form of a temporary restraining order, injunction or monetary damages, Salesperson, either in the form of a temporary restraining in order, injunction or monetary damages, Salesperson agrees to pay any costs and expenses, including, provided that the Company obtains a final judgment in it favor, reasonable attorney's fees, incurred by the Company in enforcing its rights and Salesperson's obligations under this Agreement.

22. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns. No oral agreement, statement, promise, commitment or representation shall alter or terminate the provisions of this Agreement. This Agreement may only be amended in writing signed by a principal of the Company.

23. This Agreement shall be construed, governed by and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles. Any action arising out of or relating to this Agreement may, at the election of the Company, be brought and prosecuted only in that State, and in the event of such election, Salesperson consents to the jurisdiction and venue of any court in such jurisdiction and waives trial by jury.

24. If any term, provision, covenant or restriction contained in this Agreement, or any part thereof, is held by a court of competent jurisdiction or any foreign, federal, state, county or local government or any other governmental regulatory or administrative agency or authority to by invalid, void, unenforceable or against public policy for any reason, the remainder of the terms, provision, covenants and restrictions contained in this Agreement, or any part thereof, to be unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provision and, in its reduced form, such provision shall then by enforceable and shall be enforced.

25. The Salesperson represents and warrants that he/she has not been sued for negligence of malpractice, misrepresentation or similar claims or allegations in connection with the provision of real estate brokerage or sales services.



26. The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorney's fees and expenses) arising out of or relating to (i) the gross negligence or willful misconduct in the performance and observance of Salesperson's responsibilities under this Agreement, (ii) a grossly negligent act or omission of Salesperson or any of Salesperson's agents in connection with Salesperson's performance under this Agreement or (iii) Salesperson's breach of any material term or condition of this Agreement, including, without limitation, the representations and warranties set forth herein, and (iv) any act or omission by Salesperson deemed an intentional tort, or conduct that supports an award for punitive damages, as determined by a trier of fact or arbitrator.  The Company may elect to retain its own counsel and to participate in the defense of any claim or action arising out of or relating to the foregoing.  The Salesperson shall not settle or compromise any claim or action hereunder, including, without limitation, any claim for equitable relief, without the Company's prior written consent, which consent shall not be unreasonably withheld.

27. The Salesperson waives any claim, right or entitlement to punitive damages, indirect damages or consequential damages in connection with any dispute under this Agreement.

28. Salesperson agrees not to disclose the terms of this Agreement, except in the following circumstances:

(a)  Salesperson may disclose the terms of this Agreement to his/her immediate family, so long as such family members agree to be bound by the confidential nature of this Agreement;

(b)  Salesperson may disclose the terms of this Agreement to (i) his/her tax advisors so long as such tax advisors agree in writing to be bound by the confidential nature of this Agreement; (ii) taxing authorities if requested by such authorities and so long as they are advised in writing of the confidential nature of this Agreement; or (iii) Salesperson's legal counsel; and

(c)  Pursuant to the order of a court or governmental agency of competent jurisdiction, or for purposes of securing enforcement of the terms and conditions of this Agreement.

29. All notices and other communications hereunder shall be in writing and shall be both sent via email and by one of the following hard-copy means: (a) personal delivered by messenger or (b) overnight couriers such as Federal Express, with instructions for delivery on the next business day, addressed as follows:

9

<u>If to the Company:</u>                    <u>If to the Salesperson:</u>

Bohemia Realty Group                Chelsea Picken

Each party hereto may designate in writing a new address to which any notice or other communication may thereafter be so given, served or sent. Each notice or other communication that shall be mailed in the manner described above, shall be deemed sufficiently give, served, sent or received for all purposes at such time as it is delivered to the addressee or at such time as delivery is refused by the addressee upon presentation.

30. This Agreement may not be assigned, transferred or subcontracted, in whole or in part, by the Salesperson, except to an entity solely and exclusively controlled by the Salesperson.

31. As a condition of Salesperson's provision of Brokerage Services to the Company, the parties agree that any controversy or claim arising out of, or relating to, any aspect of his/her relationship with the Company, the termination thereof, of this Agreement including, but not limited to, commission disputes, claims for breach or any contract or covenant whether express or implied, claims for compensation or benefits of any kind, tort claims, and claims for violation of any federal, state or local law, statute, regulation or ordinance shall be submitted for binding arbitration in the County of New York, State of New York to the American Arbitration Association ("AAA") and shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the AAA.  The arbitrator shall not have the authority to award attorney's fees, arbitration filing fee and administrative costs, or general costs to either party.  Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy.  Nothing in this Section precludes a party from seeking injunctive relief in court in connection with any claim requiring injunctive relief.

32. This Agreement sets forth the entire understanding and agreement of the parties hereto relating to the retention of the Salesperson by the Company, and all other previous or contemporaneous understandings or agreements relating to the retention of the Salesperson by the Company, whether written or oral, are hereby superseded.  No waiver or any one provision shall be construed as a waiver of any other provision and the fact that an obligation is waived for a period of time shall not be considered to be a continuous waiver.

33. The Salesperson represents and warrants that he/she has carefully read this Agreement, has consulted with legal counsel and/or advisors of his/her

choice (or has declined to consult advisors) fully understands all provisions of this Agreement, and executes this Agreement knowingly and willingly.

34. Within ten (10) days of either party's notice of termination of this Agreement, Salesperson shall prepare a list of all pending transactions, (which list shall indicate whether the Salesperson contends he/She was a procuring cause of the pending transaction or rather, has negotiated the pending transaction), and the gross commissions earned from such pending transactions shall be distributed as follows:

(a)  With respect to any pending transactions procured by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(b)  With respect to any pending transaction negotiated by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

(c)  With respect to any pending transactions procured by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(d)  With respect to any pending transactions negotiated by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

**35.  All desk fees are due the first of each month.  If not received by the 7th of the month, a $50 late fee will be charged for each week late.**

36.  The Salesperson is not to post any remarks on Facebook or any other social media outlet regarding their employment terms with the (COMPANY) Bohemia Realty Group, LLC nor participate in any social media conversations/comments with other employees or non-employees regarding employment, internal communications, other employees, Salespersons and/or management. The Salesperson is not to send an email to the company announcing disassociation. Security deposit will not be returned if this is done.

The determination of whether or not a transaction was "procured" by the Salesperson shall be reasonably agreed to by the parties, using industry standards and conventions, reasonably applied, including, but not limited to, the party making the initial contact with a customer, landlord or tenant, and

11



the ongoing frequency and/or quality of contact with such customer, landlord or tenant.  Any disputes under this paragraph shall be determined by binding arbitration conducted on an expedited basis.

By the signature below, the parties acknowledge, each has **READ AND UNDERSTOOD** this Independent Salesperson Agreement, including the non-disclosure, non-solicitation and non-competition paragraphs, and that each knowingly, freely and voluntarily accept, and agrees to be bound by, its terms.

**AGREED TO AND ACCEPTED:**

By: _____      ___7/18/17___

       [Agent Signature]                    Date

**BRG**

By: _____      _____

       [Broker]                         Date

<u>EXHIBIT A</u>

The Brokerage Services shall include, but not be limited to, the following:

During times and at a place determined by the Salesperson, the Salesperson shall engage in the rental, sales and brokerage of real estate; principally, **commercial** real estate in the Borough of Manhattan.  Said sales and brokerage activities shall include but not limited to developing and pursuing customer leads, developing and pursuing Exclusive Listings with property owners, negotiating the sale and lease of office, residential and retail real estate, and marketing the Company's exclusive listings.

12





## COMPANY PLEDGE

As an agent at Bohemia Realty Group, I pledge to myself, my fellow agents, and the company, that:

- I will read and follow procedures
- I will return my calls in a timely manner
- I will show up on time to my appointments, and if I cannot, I will contact my clients to let them know I'm running late
- I will treat my clients with respect and courtesy
- I will work with other agents in the company even if it doesn't immediately financially benefit me; I will be a team player
- If I commit to a task, I will follow it through

My behavior is a reflection of the company and my colleagues, and, as such, I promise to always promote a positive image for Bohemia Realty Group.

NAME   Chelsea Picken

DATE 7/16/17

SIGNATURE

WITNESS

13





## Jr. Agent Rental Splits

$150 virtual agent desk fee

| * ON OPEN | ON  BOHEMIA EXCLUSIVES | DEAL PERIOD |
|-----------|------------------------|-------------|
| 40% | 30% | 50k |
| 45% | 33% | 40k |
| 50% | 36% | 30k |

* Open listing split here is for any open rental listing without a listing agent.  Please see split breakdown sheet for commission breakdown where there is a listing agent.

After $120k worth of gross rental commissions or 60 deals, the agent becomes a senior agent and chooses plan A, B, or C.

$0 – $10 k – qualifying, showing, and closing clients
            – understanding procedures and how to relay them to clients
$10–$20k – processing applications correctly and specific to landlord
$20–$30k – fluency with applications (understanding what apps will go through; looking critically at apps)
$30–$40k – becoming independent on signing and prepping leases
$40–$50k – fluency in understanding the rental process (review of all)
Agreed to and accepted:


By: _____        _____
AGENT SIGNATURE                                       Date


By: _____        _____
BROKER (Bohemia Realty Group LLC)                  Date

14





## Contract Addendum
## Sales Agent Split

35% for first 3 closed transactions

45% for 4th, 5th, & 6th closed transactions

60% for 7th & 8th transactions

65% for 9th & 10th closed transactions

70% for 11th + closed transactions

Agreed to and accepted by:

Chelsea Picken
AGENT (Print)

AGENT (Sign)

7/18/17
Date

BROKER (Bohemia Realty Group LLC)

Date





## INDEPENDENT SALESPERSON AGREEMENT

This agreement (hereinafter referred to as the "Agreement") is for Real Estate Salesperson and Brokerage Services ("Brokerage Services") described in the attached Exhibit A, which is part of this Agreement, to be provided by _____Jordan Silver_____(the "Salesperson") to Bohemia Realty Group ("BRG" or "Company").

TERM

1. The term of this Agreement will begin on ____9/15/16____and will continue until terminated within ten (10) days' written notice by either party for any reason (the "Term").

2. During the Term, the Salesperson agrees to perform the Brokerage Services pursuant to this Agreement as an independent contractor. The Salesperson acknowledges and agrees that the Brokerage Services are to be provided in a competent and professional manner with promptness and diligence (i) in accordance with all applicable New York and United States federal, state and local laws, rules and regulations, (ii) in accordance with applicable industry rules, and (iii) in all respects to the satisfaction of the Company. The Salesperson represents and warrants that he or she has been granted a valid and current Real Estate Salesperson or Associate Broker's license by the appropriate department of the State of New York (the "Sales License") and shall provide a copy to the Company upon execution of this Agreement. The Salesperson agrees further to promptly and regularly take all necessary action and make all required payments to maintain the sales license in force and current, including but not limited to maintain continuing education requirements, such expense to be borne solely by the Salesperson. If at any time the sales license is revoked, suspended, canceled or in any way compromised or limited, the Salesperson immediately agrees to notify the Company, in writing, of any and all such facts.

3. The Salesperson shall promptly make any and all changes in his/her performance as the Company may reasonably request from time to

1

JS

time.  The Salesperson shall provide the Brokerage Services as requested by the Company with respect to various matters, including but not limited to, those described in Exhibit A herein.

4.  As compensation for the provision of the Brokerage Services, during the Term of this Agreement the Company will pay to the Salesperson a percentage of the total commission payable, and actually paid, to the Company with respect to a specific transaction on which the Salesperson provided services (the "Commission Split").  The Company will use reasonable and appropriate efforts to collect the total commission payable to the Company as a result of the Salesperson's Brokerage Services.

With respect to transactions procured and originating solely and directly by and through the Salesperson and on which the Salesperson was the sole BRG broker, agent or Principal working on the transaction, Salesperson shall be entitled to a commission split, calculated with reference to the total commissions payable and, actually paid, to the Company, i.e. prior to the Commission Split, on a calendar year basis ("Gross Annual Commissions").  NOTE: the commission split and desk fee schedule is outlined in the attached riders.

For all transactions where Salesperson does not solely procure the transaction and/or works in concert with another BRG broker, agent or Principal, commission amounts and splits shall be reasonably determined on a case-by-case basis, by prior written agreement with the Salesperson.  On each transaction for which a commission is payable, the commission amount due the Salesperson shall be reflected in a Deal Report following conclusion of the transaction.  The Company shall make commission payment to the Salesperson or the Salesperson's designated entity, within ten (10) days of the Company's receipt in full of the full commission amount or installment.

For all transactions where Salesperson refers a customer, landlord or tenant to another BRG broker, agent or Principal, Salesperson shall be entitled to a referral commission, the amount of which is to be mutually agreed upon between Salesperson and the Company.

For purposes of this Agreement, the term "Principal" shall mean the owner of an equity interest in the Company.

5.  The Company shall make available and furnish to the Salesperson reasonable office supplies and equipment for the Salesperson's use during the Term of this Agreement in the Company's office.  The Company shall, at its expense, provide to Salesperson an email address and service and access to appropriate real estate databases as determined necessary by the Company.  The Company shall

2



determine in its discretion under what terms to assign a designated multi-use or private office or a dedicated desk to the Salesperson, depending on, among other things, the Salesperson's sales performance, any office duties assumed by her/him and gross commission production.

6.  The Company shall not pay for or reimburse the Salesperson for meals or entertainment with customers, for taxis or transportation, airfare of any sort, telephone charges, or for cellular phone equipment or service.

7.  The Company shall not pay for or reimburse the Salesperson for licensure, continuing education, real estate salesperson license fees or costs, or for membership in any professional clubs or organizations.

8.  In connection with the marketing of a property available for sale or lease for which the Company is acting as the sole exclusive agent of the person or entity that seeks to sell or lease such property (an "Exclusive Listing") procured by Salesperson, Company shall provide and pay for reasonable and appropriate advertising, marketing and signage ("Publicity") shall be determined in Company's sole, but reasonable, discretion.  Notwithstanding, such discretionary rights, in such situations, i.e., when Salesperson has procured and Exclusive Listing, all Publicity shall include the name and telephone number of Salesperson in a font size and type within such Publicity to reasonably achieve notice of Salesperson's name and identity.

9.  Nothing under this Agreement shall be construed as creating any partnership, joint venture or agency between the Company and the Salesperson.  The Salesperson shall act solely as an independent contractor and, as such, is not authorized to bind the Company to third parties.

10. Neither federal, state, nor local taxes of any kind shall be withheld or paid by the Company on behalf of the Salesperson in connection with payments made by the Company under this Agreement.  The Salesperson shall be responsible for determining the amounts of and making all applicable tax payments.  The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) arising out of or relating to the foregoing responsibility of the Salesperson.

11. The Salesperson is not an employee of the Company and is not entitled to actively participate in any of the Company's current or future employee benefit plans, including, but not limited to, any retirement, pension,



profit sharing, group insurance, health insurance or similar plans that have been or may be instituted by BRG, for the benefit of its employees.

12. The Salesperson represents and warrants that he/she maintains and will maintain in effect all insurance as may be required by law.  The Company will maintain errors and omissions insurance coverage for the Company and its Salespersons.

13. During the course of Salesperson's engagement hereunder, the Salesperson may receive confidential information of and/or be in the possession of confidential information from the Company, including but not limited to, customer lists, listing information, landlord contacts and proprietary information, customer financial information, client information, services provided to such clients, trade secrets, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works or authorship, discoveries, techniques, copyrights, patents, trademarks, computer software, and any and all information and know-how not or in the future, whether or not such confidential information relates to any Work Product, as defined herein, including without limitation, the underlying concept and production methodology of such Work Product, (but excluding information and data developed or produced by Salesperson, prior to, or during the Term, information and data that may in the public domain and information and data obtain from third parties not intended for use by the Company)(hereinafter "Confidential Information").  Salesperson acknowledges and agrees that he/she has no claim, right, title, property or other interest of any kind in the Confidential Information. The Salesperson shall hold and maintain the Confidential Information in strictest of confidence and in trust for the Company's sole and exclusive benefit.  The Salesperson agreed to keep all Confidential Information in a secure place and further agrees not to publish, communicate, divulge, use or disclose directly or indirectly, for his/her own benefit or for the benefit of another, or for any purpose other than in furtherance of the Salesperson's duties hereunder, either during or after his/her engagement as a Salesperson hereunder, any Confidential Information.  Salesperson shall not discuss or disclose any Confidential Information with or to any person whatsoever, or permit any person whatsoever to examine and /or make copes of any Work Product, except as require to perform the Brokerage Services to Company or as requested by law.  Upon termination of this Agreement or upon the earlier request of the Company, the Salesperson shall deliver all written and/or recorded material, including without limitation, paper, film, cards, tapes, dvds, cds, discs and the storage facilities, in Salesperson's possession, custody or control which contain any Work

4

JS

Product and/or Confidential Information of the Company, and all copies thereof, to the Company.

(b)    If the Salesperson is requested or required by any court, agency or other governmental authority to disclose any Confidential Information, he/she shall promptly notify the Company so as to permit the Company to seek a protective order or take other appropriate action. If, in the absence of a protective order, the Salesperson is compelled as a matter of law to disclose any Confidential Information, the Salesperson shall disclose to the party compelling disclosure only such part of the Confidential Information as is required by law to be disclosed. The Salesperson shall exercise his/her best efforts to obtain assurances that confidential treatment shall be accorded Confidential Information disclosed under such circumstances.

(c)    The Salesperson acknowledges that the Confidential Information is particularly sensitive and of substantial importance to the Company; accordingly, the Salesperson agrees that the provisions of this Section dealing with Work Product and Confidential Information shall survive any termination of this Agreement and shall be enforceable against the Salesperson in perpetuity.

(d)    The Salesperson acknowledges he/she will have access to Confidential Information. If the Company so elects, it shall be entitled, in addition to all other remedies available, including, but not limited to, actual, compensatory and punitive damages, to obtain damages and, provided that the Company obtains a final judgment of any breach of this Agreement or to specifically enforce the performance by Salesperson and to enjoin the violation by Salesperson of any provision hereof. Salesperson further acknowledges that a violation of this Section 13 hereunder would cause irreparable and continuing damage to the Company for which money damages alone would not adequately compensate. Accordingly, the Salesperson acknowledges that, in the event of violation of this Section 13 of this Agreement, the Company shall be entitled to preliminary and permanent injunctive relief without having to prove actual damages or immediate or irreparable harm or to post a bond.

(e)    For the purposes of this Agreement, the term "Work Product" shall refer to all proposals, research, records, reports, recommendations, manuals, polices and procedures, finding, evaluations, forms, reviews, information, data, computer software or programs, and written materials originated or prepared by Salesperson for and in the performance of the Brokerage Services hereunder. Such Work Product shall become the exclusive property of BRG, and Salesperson shall relinquish and hereby assigns any and all right, title and interest in and to such Work Product to BRG, subject to the rights of Salesperson that survive the Term, and which rights, among other things, may allow Salesperson to exploit such Work Product. Work Product

JS

shall not include customers, landlords and tenants with whom the Salesperson has worked prior to the Term, and those procured by the Salesperson during the Term, whether or not such customer, landlord or tenant did business with the Company on an exclusive basis.

14.      The Salesperson represents and warrants to the Company that he/she is not subject to any contractual or other restriction or obligation that is inconsistent with any representation, obligation or assignment of Salesperson, any rights of the Company under this Agreement or Salesperson's acceptance of engagement with or performance of the Brokerage Services for the Company.

15.      The Salesperson represents and warrants that he/she has no been convicted of a felony crime.

16.      Throughout the Term of this Agreement, the Salesperson shall devote his/her working time, attention, knowledge and skills in furtherance of the business of the Company and will perform such duties faithfully, diligently, and to the best of his/her ability.  Salesperson shall not engage, and shall not solicit any other associates or employees of the Company or its affiliates to engage in any other commercial activities that may in any way interfere with the performance of his/her duties or responsibilities to the Company.

17.      Thought the Term of this Agreement, Salesperson will not, for any reason, directly or indirectly (whether as director, stockholder, owner, partner, consultant, principal, employee, independent contractor, agent or otherwise), engage in or contribute his/her knowledge to "Directly Competitive Work" (as defined below), unless Salesperson receives advance written permission to so do, signed by a principal of the Company, after having furnished proof satisfactory to the Company, including assurances from Salesperson and his/her new employer or Brokerage, that his/her performance for such Directly Competitive Work would not cause Salesperson to disclose, base judgments on or use any Confidential Information he/she acquired during the Term of this Agreement, or impair customer, vendor or business partner relations or the Company's goodwill, or otherwise cause special harm to the Company.

Permission to engage in competitive work, or expiration of the restricted period stated above, shall **not** release Salesperson from his/her obligation not to use or disclose Confidential Information, which shall remain proprietary to the Company.

18. For a period of two (2) years following the termination of this Agreement, Salesperson will not, for any reason, directly or indirectly: (i) solicit or recruit for employment, hire, employ or attempt to employ or engage as an independent contractor or consultant any individual employed by or associated with the Company as of the termination of this Agreement or

6



during the last year of the Term, or entice or suggest to such individual to terminate his or her employment of association with the Company; (ii) canvas or solicit business from any customer, tenant, or landlord with whom the Company did business during the Term of this Agreement, except for any such customer, client, tenant or landlord whose business with the Company was exclusively or primarily accomplished (A) by Salesperson, or (B) through Salesperson's direct and personal efforts, or, in any such circumstance, an entity affiliated with, and controlled by, such customer, client, tenant or landlord.

19. After the Term, nothing in this Agreement shall prevent the Salesperson from: working with or representing a customer, client, landlord or tenant that worked with Salesperson during the Term, provided that the Salesperson does not solicit such customer, client, landlord or tenant during the Term or within two (2) years following the expiration of the Term in violation of the prohibitions provided for in section 18(ii), hereof.

20. For a period of two (2) year following the termination of this Agreement, Salesperson will not take any action which is intended, or would reasonably be expected, to adversely affect the Company, its business, its Principals, reputation or its relationship with its customers or prospective customers, vendors, business partners or the Company's employees, except as otherwise permitted hereby, the aforementioned collectively referred to as "Non-Disparagement Agreement" or "Non-Disparagement."  Notwithstanding Salesperson's obligation under this paragraph 20, Salesperson shall have the right, following the Term, to engage in work constituting, concerning or relate to, the sales, leasing and brokerage of commercial real estate in any borough located in New York City, albeit subject to the restrictions on solicitations as wet forth in paragraph 18.

21. The Salesperson understands that the Company will have the right to pursue arbitration against him/her for violation of the Non-Solicitation and to collect monetary damages if a court or arbitrator finds that any violation of this Non-Solicitation resulted in any monetary loss to the Company.  Salesperson agrees that his/her violation of any of the Terms of the Non-Solicitation will result in irreparable harm and continuing damage to the Company for which monetary dames may not provide and adequate remedy.  Therefore, in addition to the Company's right to pursue arbitration against Salesperson for money damages, Salesperson agrees that the Company shall have the right to apply to a court for a temporary restraining order, and/or temporary or permanent injunction preventing him/her from violating the provisions of this Agreement.  Salesperson hereby submits to the jurisdiction of the Supreme Court of the State of New York, and the United States District Court of the Southern District of New York, for the purpose of such enforcement and Salesperson waives, and agrees not to assert, as a defense in any such

JS

action or proceeding, that he/she was not subject to the personal jurisdiction of that court or that venue is improper for lack of residence, inconvenient forum or otherwise. Salesperson also agrees that services of process (the method by which Salesperson may be served with any such court papers) may be made upon him/her by nationally recognized overnight delivery service at the address last known to the Company. The Company may also have other rights and remedies it may have at any time against Salesperson, whether by law or under this Agreement. In the event the Company obtains any relief from a court against Salesperson, either in the form of a temporary restraining order, injunction or monetary damages, Salesperson, either in the form of a temporary restraining in order, injunction or monetary damages, Salesperson agrees to pay any costs and expenses, including, provided that the Company obtains a final judgment in it favor, reasonable attorney's fees, incurred by the Company in enforcing its rights and Salesperson's obligations under this Agreement.

22. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns. No oral agreement, statement, promise, commitment or representation shall alter or terminate the provisions of this Agreement. This Agreement may only be amended in writing signed by a principal of the Company.

23. This Agreement shall be construed, governed by and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles. Any action arising out of or relating to this Agreement may, at the election of the Company, be brought and prosecuted only in that State, and in the event of such election, Salesperson consents to the jurisdiction and venue of any court in such jurisdiction and waives trial by jury.

24. If any term, provision, covenant or restriction contained in this Agreement, or any part thereof, is held by a court of competent jurisdiction or any foreign, federal, state, county or local government or any other governmental regulatory or administrative agency or authority to by invalid, void, unenforceable or against public policy for any reason, the remainder of the terms, provision, covenants and restrictions contained in this Agreement, or any part thereof, to be unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provision and, in its reduced form, such provision shall then by enforceable and shall be enforced.

25. The Salesperson represents and warrants that he/she has not been sued for negligence of malpractice, misrepresentation or similar claims or allegations in connection with the provision of real estate brokerage or sales services.



26. The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorney's fees and expenses) arising out of or relating to (i) the gross negligence or willful misconduct in the performance and observance of Salesperson's responsibilities under this Agreement, (ii) a grossly negligent act or omission of Salesperson or any of Salesperson's agents in connection with Salesperson's performance under this Agreement or (iii) Salesperson's breach of any material term or condition of this Agreement, including, without limitation, the representations and warranties set forth herein, and (iv) any act or omission by Salesperson deemed an intentional tort, or conduct that supports an award for punitive damages, as determined by a trier of fact or arbitrator.  The Company may elect to retain its own counsel and to participate in the defense of any claim or action arising out of or relating to the foregoing.  The Salesperson shall not settle or compromise any claim or action hereunder, including, without limitation, any claim for equitable relief, without the Company's prior written consent, which consent shall not be unreasonably withheld.

27. The Salesperson waives any claim, right or entitlement to punitive damages, indirect damages or consequential damages in connection with any dispute under this Agreement.

28. Salesperson agrees not to disclose the terms of this Agreement, except in the following circumstances:

(a) Salesperson may disclose the terms of this Agreement to his/her immediate family, so long as such family members agree to be bound by the confidential nature of this Agreement;

(b) Salesperson may disclose the terms of this Agreement to (i) his/her tax advisors so long as such tax advisors agree in writing to be bound by the confidential nature of this Agreement; (ii) taxing authorities if requested by such authorities and so long as they are advised in writing of the confidential nature of this Agreement; or (iii) Salesperson's legal counsel; and

(c) Pursuant to the order of a court or governmental agency of competent jurisdiction, or for purposes of securing enforcement of the terms and conditions of this Agreement.

29. All notices and other communications hereunder shall be in writing and shall be both sent via email and by one of the following hard-copy means: (a) personal delivered by messenger or (b) overnight couriers such as Federal Express, with instructions for delivery on the next business day, addressed as follows:

9



| If to the Company: | If to the Salesperson: |
|---|---|
| Bohemia Realty Group | Jordan Silver |

Each party hereto may designate in writing a new address to which any notice or other communication may thereafter be so given, served or sent. Each notice or other communication that shall be mailed in the manner described above, shall be deemed sufficiently give, served, sent or received for all purposes at such time as it is delivered to the addressee or at such time as delivery is refused by the addressee upon presentation.

30. This Agreement may not be assigned, transferred or subcontracted, in whole or in part, by the Salesperson, except to an entity solely and exclusively controlled by the Salesperson.

31. As a condition of Salesperson's provision of Brokerage Services to the Company, the parties agree that any controversy or claim arising out of, or relating to, any aspect of his/her relationship with the Company, the termination thereof, of this Agreement including, but not limited to, commission disputes, claims for breach or any contract or covenant whether express or implied, claims for compensation or benefits of any kind, tort claims, and claims for violation of any federal, state or local law, statute, regulation or ordinance shall be submitted for binding arbitration in the County of New York, State of New York to the American Arbitration Association ("AAA") and shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the AAA. The arbitrator shall not have the authority to award attorney's fees, arbitration filing fee and administrative costs, or general costs to either party. Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy. Nothing in this Section precludes a party from seeking injunctive relief in court in connection with any claim requiring injunctive relief.

32. This Agreement sets forth the entire understanding and agreement of the parties hereto relating to the retention of the Salesperson by the Company, and all other previous or contemporaneous understandings or agreements relating to the retention of the Salesperson by the Company, whether written or oral, are hereby superseded. No waiver or any one provision shall be construed as a waiver of any other provision and the fact that an obligation is waived for a period of time shall not be considered to be a continuous waiver.

33. The Salesperson represents and warrants that he/she has carefully read this Agreement, has consulted with legal counsel and/or advisors of his/her choice (or has declined to consult advisors) fully understands all provisions of this Agreement, and executes this Agreement knowingly and willingly.

10



34. Within ten (10) days of either party's notice of termination of this Agreement, Salesperson shall prepare a list of all pending transactions, (which list shall indicate whether the Salesperson contends he/She was a procuring cause of the pending transaction or rather, has negotiated the pending transaction), and the gross commissions earned from such pending transactions shall be distributed as follows:

(a) With respect to any pending transactions procured by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(b) With respect to any pending transaction negotiated by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

(c) With respect to any pending transactions procured by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(d)        With respect to any pending transactions negotiated by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

**35. All desk fees are due the first of each month. If not received by the 7th of the month, a $50 late fee will be charged for each week late.**

The determination of whether or not a transaction was "procured" by the Salesperson shall be reasonably agreed to by the parties, using industry standards and conventions, reasonably applied, including, but not limited to, the party making the initial contact with a customer, landlord or tenant, and the ongoing frequency and/or quality of contact with such customer, landlord or tenant. Any disputes under this paragraph shall be determined by binding arbitration conducted on an expedited basis.

By the signature below, the parties acknowledge, each has **READ AND UNDERSTOOD** this Independent Salesperson Agreement, including the non-disclosure, non-solicitation and non-competition paragraphs, and that each knowingly, freely and voluntarily accept, and agrees to be bound by, its terms.

11



**AGREED TO AND ACCEPTED:**

By: _____        9/14/16
        [Agent Signature]                    Date

**BRG**

By: _____        _____
        [Broker]                                    Date

<u>EXHIBIT A</u>

The Brokerage Services shall include, but not be limited to, the following:

During times and at a place determined by the Salesperson, the Salesperson shall engage in the rental, sales and brokerage of real estate; principally, **commercial** real estate in the Borough of Manhattan. Said sales and brokerage activities shall include but not limited to developing and pursuing customer leads, developing and pursuing Exclusive Listings with property owners, negotiating the sale and lease of office, residential and retail real estate, and marketing the Company's exclusive listings.

12



## COMPANY PLEDGE

As an agent at Bohemia Realty Group, I pledge to myself, my fellow agents, and the company, that:

- I will read and follow procedures
- I will return my calls in a timely manner
- I will show up on time to my appointments, and if I cannot, I will contact my clients to let them know I'm running late
- I will treat my clients with respect and courtesy
- I will work with other agents in the company even if it doesn't immediately financially benefit me; I will be a team player
- If I commit to a task, I will follow it through

My behavior is a reflection of the company and my colleagues, and, as such, I promise to always promote a positive image for Bohemia Realty Group.

**NAME** _Jordan Silver_

**DATE** _9/14/16_

**SIGNATURE**

**WITNESS**



## Jr. Agent Rental Splits

$150 virtual agent desk fee

| * ON OPEN | ON BOHEMIA EXCLUSIVES | DEAL PERIOD |
|-----------|-----------------------|-------------|
| 40% | 30% | 50k |
| 45% | 33% | 40k |
| 50% | 36% | 30k |

* Open listing split here is for any open rental listing without a listing agent.  Please see split breakdown sheet for commission breakdown where there is a listing agent.

After $120k worth of gross rental commissions or 60 deals, the agent becomes a senior agent and chooses plan A, B, or C.

$0 – $10 k – qualifying, showing, and closing clients
– understanding procedures and how to relay them to clients
$10–$20k – processing applications correctly and specific to landlord
$20–$30k – fluency with applications (understanding what apps will go through; looking critically at apps)
$30–$40k – becoming independent on signing and prepping leases
$40–$50k – fluency in understanding the rental process (review of all)
Agreed to and accepted:


By: _____      9/14/16
AGENT SIGNATURE                              _____
                                             Date

By: _____      _____
BROKER (Bohemia Realty Group LLC)            Date



## Contract Addendum
## Sales Agent Split

**50% for first 3 closed sales transactions**

**55% for 4th, 5th & 6th closed transactions**

**60% for 7th & 8th closed transactions**

**65% for 9th & 10th closed transaction**

**70% for 11th + closed transaction**

***BRG will apply sales closings retroactively for any sales deals agent has closed at BRG.

Agreed to and accepted by:

_____        9/14/16
AGENT                                              Date

_____        _____
BROKER (Bohemia Realty Group LLC)        Date

15



<u>INDEPENDENT SALESPERSON AGREEMENT</u>

This agreement (hereinafter referred to as the "Agreement") is for Real Estate Salesperson and Brokerage Services ("Brokerage Services") described in the attached Exhibit A, which is part of this Agreement, to be provided by **Matthew Kiernan** (the "Salesperson") to Bohemia Realty Group ("BRG" or "Company").

<u>TERM</u>

1. The term of this Agreement will begin on October 15th, 2014 and will continue until terminated within ten (10) days' written notice by either party for any reason (the "Term").

2. During the Term, the Salesperson agrees to perform the Brokerage Services pursuant to this Agreement as an independent contractor. The Salesperson acknowledges and agrees that the Brokerage Services are to be provided in a competent and professional manner with promptness and diligence (i) in accordance with all applicable New York and United States federal, state and local laws, rules and regulations, (ii) in accordance with applicable industry rules, and (iii) in all respects to the satisfaction of the Company. The Salesperson represents and warrants that he or she has been granted a valid and current Real Estate Salesperson or Associate Broker's license by the appropriate department of the State of New York (the "Sales License") and shall provide a copy to the Company upon execution of this Agreement. The Salesperson agrees further to promptly and regularly take all necessary action and make all required payments to maintain the sales license in force and current, including but not limited to maintain continuing education requirements, such expense to be borne solely by the Salesperson. If at any time the sales license is revoked, suspended, canceled or in any way compromised or limited, the Salesperson immediately agrees to notify the Company, in writing, of any and all such facts.

3. The Salesperson shall promptly make any and all changes in his/her performance as the Company may reasonably request from time to

MK

time.  The Salesperson shall provide the Brokerage Services as requested by the Company with respect to various matters, including but not limited to, those described in Exhibit A herein.

4.  As compensation for the provision of the Brokerage Services, during the Term of this Agreement the Company will pay to the Salesperson a percentage of the total commission payable, and actually paid, to the Company with respect to a specific transaction on which the Salesperson provided services (the "Commission Split").  The Company will use reasonable and appropriate efforts to collect the total commission payable to the Company as a result of the Salesperson's Brokerage Services.

With respect to transactions procured and originating solely and directly by and through the Salesperson and on which the Salesperson was the sole BRG broker, agent or Principal working on the transaction, Salesperson shall be entitled to a commission split, calculated with reference to the total commissions payable and, actually paid, to the Company, i.e. prior to the Commission Split, on a calendar year basis ("Gross Annual Commissions").  NOTE: the commission split and desk fee schedule is outlined in the attached riders.

For all transactions where Salesperson does not solely procure the transaction and/or works in concert with another BRG broker, agent or Principal, commission amounts and splits shall be reasonably determined on a case-by-case basis, by prior written agreement with the Salesperson.  On each transaction for which a commission is payable, the commission amount due the Salesperson shall be reflected in a Deal Report following conclusion of the transaction.  The Company shall make commission payment to the Salesperson or the Salesperson's designated entity, within ten (10) days of the Company's receipt in full of the full commission amount or installment.

For all transactions where Salesperson refers a customer, landlord or tenant to another BRG broker, agent or Principal, Salesperson shall be entitled to a referral commission, the amount of which is to be mutually agreed upon between Salesperson and the Company.

For purposes of this Agreement, the term "Principal" shall mean the owner of an equity interest in the Company.

5.  The Company shall make available and furnish to the Salesperson reasonable office supplies and equipment for the Salesperson's use during the Term of this Agreement in the Company's office.  The Company shall, at its expense, provide to Salesperson an email address and service and access to appropriate real estate databases as determined necessary by the Company.  The Company shall

MK

determine in its discretion under what terms to assign a designated multi-use or private office or a dedicated desk to the Salesperson, depending on, among other things, the Salesperson's sales performance, any office duties assumed by her/him and gross commission production.

6.  The Company shall not pay for or reimburse the Salesperson for meals or entertainment with customers, for taxis or transportation, airfare of any sort, telephone charges, or for cellular phone equipment or service.

7.  The Company shall not pay for or reimburse the Salesperson for licensure, continuing education, real estate salesperson license fees or costs, or for membership in any professional clubs or organizations.

8.  In connection with the marketing of a property available for sale or lease for which the Company is acting as the sole exclusive agent of the person or entity that seeks to sell or lease such property (an "Exclusive Listing") procured by Salesperson, Company shall provide and pay for reasonable and appropriate advertising, marketing and signage ("Publicity") shall be determined in Company's sole, but reasonable, discretion.  Notwithstanding, such discretionary rights, in such situations, i.e., when Salesperson has procured and Exclusive Listing, all Publicity shall include the name and telephone number of Salesperson in a font size and type within such Publicity to reasonably achieve notice of Salesperson's name and identity.

9.  Nothing under this Agreement shall be construed as creating any partnership, joint venture or agency between the Company and the Salesperson.  The Salesperson shall act solely as an independent contractor and, as such, is not authorized to bind the Company to third parties.

10. Neither federal, state, nor local taxes of any kind shall be withheld or paid by the Company on behalf of the Salesperson in connection with payments made by the Company under this Agreement.  The Salesperson shall be responsible for determining the amounts of and making all applicable tax payments.  The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees and expenses) arising out of or relating to the foregoing responsibility of the Salesperson.

11. The Salesperson is not an employee of the Company and is not entitled to actively participate in any of the Company's current or future employee benefit plans, including, but not limited to, any retirement, pension,

profit sharing, group insurance, health insurance or similar plans that have been or may be instituted by BRG, for the benefit of its employees.

12. The Salesperson represents and warrants that he/she maintains and will maintain in effect all insurance as may be required by law.  The Company will maintain errors and omissions insurance coverage for the Company and its Salespersons.

13. During the course of Salesperson's engagement hereunder, the Salesperson may receive confidential information of and/or be in the possession of confidential information from the Company, including but not limited to, customer lists, listing information, landlord contacts and proprietary information, customer financial information, client information, services provided to such clients, trade secrets, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works or authorship, discoveries, techniques, copyrights, patents, trademarks, computer software, and any and all information and know-how not or in the future, whether or not such confidential information relates to any Work Product, as defined herein, including without limitation, the underlying concept and production methodology of such Work Product, (but excluding information and data developed or produced by Salesperson, prior to, or during the Term, information and data that may in the public domain and information and data obtain from third parties not intended for use by the Company)(hereinafter "Confidential Information").  Salesperson acknowledges and agrees that he/she has no claim, right, title, property or other interest of any kind in the Confidential Information. The Salesperson shall hold and maintain the Confidential Information in strictest of confidence and in trust for the Company's sole and exclusive benefit.  The Salesperson agreed to keep all Confidential Information in a secure place and further agrees not to publish, communicate, divulge, use or disclose directly or indirectly, for his/her own benefit or for the benefit of another, or for any purpose other than in furtherance of the Salesperson's duties hereunder, either during or after his/her engagement as a Salesperson hereunder, any Confidential Information.  Salesperson shall not discuss or disclose any Confidential Information with or to any person whatsoever, or permit any person whatsoever to examine and /or make copes of any Work Product, except as require to perform the Brokerage Services to Company or as requested by law.  Upon termination of this Agreement or upon the earlier request of the Company, the Salesperson shall deliver all written and/or recorded material, including without limitation, paper, film, cards, tapes, dvds, cds, discs and the storage facilities, in Salesperson's possession, custody or control which contain any Work

Product and/or Confidential Information of the Company, and all copies thereof, to the Company.

(b)     If the Salesperson is requested or required by any court, agency or other governmental authority to disclose any Confidential Information, he/she shall promptly notify the Company so as to permit the Company to seek a protective order or take other appropriate action.  If, in the absence of a protective order, the Salesperson is compelled as a matter of law to disclose any Confidential Information, the Salesperson shall disclose to the party compelling disclosure only such part of the Confidential Information as is required by law to be disclosed.  The Salesperson shall exercise his/her best efforts to obtain assurances that confidential treatment shall be accorded Confidential Information disclosed under such circumstances.

(c)     The Salesperson acknowledges that the Confidential Information is particularly sensitive and of substantial importance to the Company; accordingly, the Salesperson agrees that the provisions of this Section dealing with Work Product and Confidential Information shall survive any termination of this Agreement and shall be enforceable against the Salesperson in perpetuity.

(d)     The Salesperson acknowledges he/she will have access to Confidential Information.  If the Company so elects, it shall be entitled, in addition to all other remedies available, including, but not limited to, actual, compensatory and punitive damages, to obtain damages and, provided that the Company obtains a final judgment of any breach of this Agreement or to specifically enforce the performance by Salesperson and to enjoin the violation by Salesperson of any provision hereof.  Salesperson further acknowledges that a violation of this Section 13 hereunder would cause irreparable and continuing damage to the Company for which money damages alone would not adequately compensate.  Accordingly, the Salesperson acknowledges that, in the event of violation of this Section 13 of this Agreement, the Company shall be entitled to preliminary and permanent injunctive relief without having to prove actual damages or immediate or irreparable harm or to post a bond.

(e)     For the purposes of this Agreement, the term "Work Product" shall refer to all proposals, research, records, reports, recommendations, manuals, polices and procedures, finding, evaluations, forms, reviews, information, data, computer software or programs, and written materials originated or prepared by Salesperson for and in the performance of the Brokerage Services hereunder.  Such Work Product shall become the exclusive property of BRG, and Salesperson shall relinquish and hereby assigns any and all right, title and interest in and to such Work Product to BRG, subject to the rights of Salesperson that survive the Term, and which rights, among other things, may allow Salesperson to exploit such Work Product.  Work Product

shall not include customers, landlords and tenants with whom the Salesperson has worked prior to the Term, and those procured by the Salesperson during the Term, whether or not such customer, landlord or tenant did business with the Company on an exclusive basis.

14.      The Salesperson represents and warrants to the Company that he/she is not subject to any contractual or other restriction or obligation that is inconsistent with any representation, obligation or assignment of Salesperson, any rights of the Company under this Agreement or Salesperson's acceptance of engagement with or performance of the Brokerage Services for the Company.

15.      The Salesperson represents and warrants that he/she has no been convicted of a felony crime.

16.      Throughout the Term of this Agreement, the Salesperson shall devote his/her working time, attention, knowledge and skills in furtherance of the business of the Company and will perform such duties faithfully, diligently, and to the best of his/her ability.  Salesperson shall not engage, and shall not solicit any other associates or employees of the Company or its affiliates to engage in any other commercial activities that may in any way interfere with the performance of his/her duties or responsibilities to the Company.

17.      Thought the Term of this Agreement, Salesperson will not, for any reason, directly or indirectly (whether as director, stockholder, owner, partner, consultant, principal, employee, independent contractor, agent or otherwise), engage in or contribute his/her knowledge to "Directly Competitive Work" (as defined below), unless Salesperson receives advance written permission to so do, signed by a principal of the Company, after having furnished proof satisfactory to the Company, including assurances from Salesperson and his/her new employer or Brokerage, that his/her performance for such Directly Competitive Work would not cause Salesperson to disclose, base judgments on or use any Confidential Information he/she acquired during the Term of this Agreement, or impair customer, vendor or business partner relations or the Company's goodwill, or otherwise cause special harm to the Company.

Permission to engage in competitive work, or expiration of the restricted period stated above, shall ***not*** release Salesperson from his/her obligation not to use or disclose Confidential Information, which shall remain proprietary to the Company.

18. For a period of two (2) years following the termination of this Agreement, Salesperson will not, for any reason, directly or indirectly: (i) solicit or recruit for employment, hire, employ or attempt to employ or engage as an independent contractor or consultant any individual employed by or associated with the Company as of the termination of this Agreement or

during the last year of the Term, or entice or suggest to such individual to terminate his or her employment of association with the Company; (ii) canvas or solicit business from any customer, tenant, or landlord with whom the Company did business during the Term of this Agreement, except for any such customer, client, tenant or landlord whose business with the Company was exclusively or primarily accomplished (A) by Salesperson, or (B) through Salesperson's direct and personal efforts, or, in any such circumstance, an entity affiliated with, and controlled by, such customer, client, tenant or landlord.

19. After the Term, nothing in this Agreement shall prevent the Salesperson from: working with or representing a customer, client, landlord or tenant that worked with Salesperson during the Term, provided that the Salesperson does not solicit such customer, client, landlord or tenant during the Term or within two (2) years following the expiration of the Term in violation of the prohibitions provided for in section 18(ii), hereof.

20. For a period of two (2) year following the termination of this Agreement, Salesperson will not take any action which is intended, or would reasonably be expected, to adversely affect the Company, its business, its Principals, reputation or its relationship with its customers or prospective customers, vendors, business partners or the Company's employees, except as otherwise permitted hereby, the aforementioned collectively referred to as "Non-Disparagement Agreement" or "Non-Disparagement." Notwithstanding Salesperson's obligation under this paragraph 20, Salesperson shall have the right, following the Term, to engage in work constituting, concerning or relate to, the sales, leasing and brokerage of commercial real estate in any borough located in New York City, albeit subject to the restrictions on solicitations as wet forth in paragraph 18.

21. The Salesperson understands that the Company will have the right to pursue arbitration against him/her for violation of the Non-Solicitation and to collect monetary damages if a court or arbitrator finds that any violation of this Non-Solicitation resulted in any monetary loss to the Company. Salesperson agrees that his/her violation of any of the Terms of the Non-Solicitation will result in irreparable harm and continuing damage to the Company for which monetary dames may not provide and adequate remedy. Therefore, in addition to the Company's right to pursue arbitration against Salesperson for money damages, Salesperson agrees that the Company shall have the right to apply to a court for a temporary restraining order, and/or temporary or permanent injunction preventing him/her from violating the provisions of this Agreement. Salesperson hereby submits to the jurisdiction of the Supreme Court of the State of New York, and the United States District Court of the Southern District of New York, for the purpose of such enforcement and Salesperson waives, and agrees not to assert, as a defense in any such

MK

action or proceeding, that he/she was not subject to the personal jurisdiction of that court or that venue is improper for lack of residence, inconvenient forum or otherwise.  Salesperson also agrees that services of process (the method by which Salesperson may be served with any such court papers) may be made upon him/her by nationally recognized overnight delivery service at the address last known to the Company.  The Company may also have other rights and remedies it may have at any time against Salesperson, whether by law or under this Agreement.  In the event the Company obtains any relief from a court against Salesperson, either in the form of a temporary restraining order, injunction or monetary damages, Salesperson, either in the form of a temporary restraining in order, injunction or monetary damages, Salesperson agrees to pay any costs and expenses, including, provided that the Company obtains a final judgment in it favor, reasonable attorney's fees, incurred by the Company in enforcing its rights and Salesperson's obligations under this Agreement.

22. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.  No oral agreement, statement, promise, commitment or representation shall alter or terminate the provisions of this Agreement.  This Agreement may only be amended in writing signed by a principal of the Company.

23. This Agreement shall be construed, governed by and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles.  Any action arising out of or relating to this Agreement may, at the election of the Company, be brought and prosecuted only in that State, and in the event of such election, Salesperson consents to the jurisdiction and venue of any court in such jurisdiction and waives trial by jury.

24. If any term, provision, covenant or restriction contained in this Agreement, or any part thereof, is held by a court of competent jurisdiction or any foreign, federal, state, county or local government or any other governmental regulatory or administrative agency or authority to by invalid, void, unenforceable or against public policy for any reason, the remainder of the terms, provision, covenants and restrictions contained in this Agreement, or any part thereof, to be unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provision and, in its reduced form, such provision shall then by enforceable and shall be enforced.

25. The Salesperson represents and warrants that he/she has not been sued for negligence of malpractice, misrepresentation or similar claims or allegations in connection with the provision of real estate brokerage or sales services.

MK

26. The Salesperson shall indemnify, defend and hold the Company, its officers, directors, agents, employees, contractors and shareholders harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorney's fees and expenses) arising out of or relating to (i) the gross negligence or willful misconduct in the performance and observance of Salesperson's responsibilities under this Agreement, (ii) a grossly negligent act or omission of Salesperson or any of Salesperson's agents in connection with Salesperson's performance under this Agreement or (iii) Salesperson's breach of any material term or condition of this Agreement, including, without limitation, the representations and warranties set forth herein, and (iv) any act or omission by Salesperson deemed an intentional tort, or conduct that supports an award for punitive damages, as determined by a trier of fact or arbitrator.  The Company may elect to retain its own counsel and to participate in the defense of any claim or action arising out of or relating to the foregoing.  The Salesperson shall not settle or compromise any claim or action hereunder, including, without limitation, any claim for equitable relief, without the Company's prior written consent, which consent shall not be unreasonably withheld.

27. The Salesperson waives any claim, right or entitlement to punitive damages, indirect damages or consequential damages in connection with any dispute under this Agreement.

28. Salesperson agrees not to disclose the terms of this Agreement, except in the following circumstances:

(a) Salesperson may disclose the terms of this Agreement to his/her immediate family, so long as such family members agree to be bound by the confidential nature of this Agreement;

(b) Salesperson may disclose the terms of this Agreement to (i) his/her tax advisors so long as such tax advisors agree in writing to be bound by the confidential nature of this Agreement; (ii) taxing authorities if requested by such authorities and so long as they are advised in writing of the confidential nature of this Agreement; or (iii) Salesperson's legal counsel; and

(c) Pursuant to the order of a court or governmental agency of competent jurisdiction, or for purposes of securing enforcement of the terms and conditions of this Agreement.

29. All notices and other communications hereunder shall be in writing and shall be both sent via email and by one of the following hard-copy means: (a) personal delivered by messenger or (b) overnight couriers such as Federal Express, with instructions for delivery on the next business day, addressed as follows:

MK

If to the Company:                          If to the Salesperson:

Bohemia Realty Group

Each party hereto may designate in writing a new address to which any notice or other communication may thereafter be so given, served or sent.  Each notice or other communication that shall be mailed in the manner described above, shall be deemed sufficiently give, served, sent or received for all purposes at such time as it is delivered to the addressee or at such time as delivery is refused by the addressee upon presentation.

30. This Agreement may not be assigned, transferred or subcontracted, in whole or in part, by the Salesperson, except to an entity solely and exclusively controlled by the Salesperson.

31. As a condition of Salesperson's provision of Brokerage Services to the Company, the parties agree that any controversy or claim arising out of, or relating to, any aspect of his/her relationship with the Company, the termination thereof, of this Agreement including, but not limited to, commission disputes, claims for breach or any contract or covenant whether express or implied, claims for compensation or benefits of any kind, tort claims, and claims for violation of any federal, state or local law, statute, regulation or ordinance shall be submitted for binding arbitration in the County of New York, State of New York to the American Arbitration Association ("AAA") and shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the AAA.  The arbitrator shall not have the authority to award attorney's fees, arbitration filing fee and administrative costs, or general costs to either party.  Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy.  Nothing in this Section precludes a party from seeking injunctive relief in court in connection with any claim requiring injunctive relief.

32. This Agreement sets forth the entire understanding and agreement of the parties hereto relating to the retention of the Salesperson by the Company, and all other previous or contemporaneous understandings or agreements relating to the retention of the Salesperson by the Company, whether written or oral, are hereby superseded.  No waiver or any one provision shall be construed as a waiver of any other provision and the fact that an obligation is waived for a period of time shall not be considered to be a continuous waiver.

33. The Salesperson represents and warrants that he/she has carefully read this Agreement, has consulted with legal counsel and/or advisors of his/her choice (or has declined to consult advisors) fully understands all provisions of this Agreement, and executes this Agreement knowingly and willingly.

MK

34. Within ten (10) days of either party's notice of termination of this Agreement, Salesperson shall prepare a list of all pending transactions, (which list shall indicate whether the Salesperson contends he/She was a procuring cause of the pending transaction or rather, has negotiated the pending transaction), and the gross commissions earned from such pending transactions shall be distributed as follows:

(a) With respect to any pending transactions procured by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(b) With respect to any pending transaction negotiated by Salesperson and thereafter closed by Salesperson, individually, or as a salesperson engaged by another entity, the Company shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

(c) With respect to any pending transactions procured by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the schedule provided for in paragraph 4 above.

(d) With respect to any pending transactions negotiated by Salesperson and thereafter closed by the Company, the Salesperson shall be entitled to commissions in accordance with the agreement between the Salesperson and the Company as contemplated by paragraph 4 above.

**35.  All desk fees are due the first of each month.  If not received by the 7th of the month, a $50 late fee will be charged for each week late.**


The determination of whether or not a transaction was "procured" by the Salesperson shall be reasonably agreed to by the parties, using industry standards and conventions, reasonably applied, including, but not limited to, the party making the initial contact with a customer, landlord or tenant, and the ongoing frequency and/or quality of contact with such customer, landlord or tenant.  Any disputes under this paragraph shall be determined by binding arbitration conducted on an expedited basis.

By the signature below, the parties acknowledge, each has **READ AND UNDERSTOOD** this Independent Salesperson Agreement, including the non-disclosure, non-solicitation and non-competition paragraphs, and that each knowingly, freely and voluntarily accept, and agrees to be bound by, its terms.

MK

**AGREED TO AND ACCEPTED:**

By: _____     10/15/14
      [Agent]                                    Date

**BRG**

By: _____     11/17/14
      [Agent]                                    Date

<u>EXHIBIT A</u>

The Brokerage Services shall include, but not be limited to, the following:

During times and at a place determined by the Salesperson, the Salesperson shall engage in the rental, sales and brokerage of real estate; principally, **commercial** real estate in the Borough of Manhattan.  Said sales and brokerage activities shall include but not limited to developing and pursuing customer leads, developing and pursuing Exclusive Listings with property owners, negotiating the sale and lease of office, residential and retail real estate, and marketing the Company's exclusive listings.



## COMPANY PLEDGE

**As an agent at Bohemia Realty Group, I pledge to myself, my fellow agents, and the company, that:**

- **I will read and follow procedures**
- **I will return my calls in a timely manner**
- **I will show up on time to my appointments, and if I cannot, I will contact my clients to let them know I'm running late**
- **I will treat my clients with respect and courtesy**
- **I will work with other agents in the company even if it doesn't immediately financially benefit me; I will be a team player**
- **If I commit to a task, I will follow it through**

**My behavior is a reflection of the company and my colleagues, and, as such, I promise to always promote a positive image for Bohemia Realty Group.**

**NAME** _Matthew   Kiernan_

**DATE** _10 / 15 / 14_

**SIGNATURE** _(signature)_

**WITNESS** _____

13

_MK_



## Jr. Agent Splits

$150 virtual agent desk fee

| * ON OPEN | ON BOHEMIA EXCLUSIVES | DEAL PERIOD |
|-----------|----------------------|-------------|
| 40% | 30% | 50k |
| 45% | 33% | 40k |
| 50% | 36% | 30k |

* Open listing split here is for any open listing without a listing agent.  Please see split breakdown sheet for commission breakdown where there is a listing agent.

After $120k worth of gross commissions or 60 deals, Matthew becomes a senior agent and chooses plan A, B, or C.

$0 – $10 k – qualifying, showing, and closing clients
         – understanding procedures and how to relay them to clients
$10–$20k – processing applications correctly and specific to landlord
$20–$30k – fluency with applications (understanding what apps will go through; looking critically at apps)
$30–$40k – becoming independent on signing and prepping leases
$40–$50k – fluency in understanding the rental process (review of all)
Agreed to and accepted:

By: _____     Date 10/15/14
AGENT

By: _____     Date 11/17/14
BROKER (Bohemia Realty Group LLC)

14



## Contract Addendum
## Sales Agent Split
### (for all deals closed in 2014)

**50% to Bohemia Realty Group LLC**

**50% to the Agent: Matthew Kiernan**

Agreed to and accepted by:

_____   _____
AGENT                              10/15/14
                                   Date

_____   _____
BROKER (Bohemia Realty Group LLC)  1/17/14
                                   Date

15

## Trainee Splits for Open Listings with Listing Agents

| Split Level | On 80% net (Straight open – no listing agent) | | On 70% net (Listing agent takes 10% of Gross) | | On 65% net (Listing agent takes 15% of gross) | | On 60% net (Listing agent takes 20% of gross) | |
|---|---|---|---|---|---|---|---|---|
| | Agent | Trainer | Agent | Trainer | Agent | Trainer | Agent | Trainer |
| $0-$50K | 40% | 40% | 35% | 35% | 32.5% | 32.5% | 30% | 30% |
| $50-$90K | 45% | 35% | 39.4% | 30.6% | 36.6% | 28.4% | 33.8% | 26.2% |
| $90K-$120K | 50% | 30% | 43.8% | 26.2% | 40.6% | 24.4% | 37.5% | 22.5% |

* For all splits, the percentage ratio is based on the standard open listing, calculated as a percentage of the 80% that remains after Bohemia Realty Group takes its 20% of the gross.
* All numbers have been rounded to the nearest tenth of a percent, always favoring the Agent.
* 40% of gross to Agent equals net 50% (agent) / 50% (trainer)
* 45% of gross to Agent equals net 56.25% (agent) / 43.75% (trainer)
* 50% of gross to Agent equals net 62.5% (agent) / 37.5% (trainer)

MK